**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

EDWARD AVILA, et al.,

    **Plaintiffs,**

      **v.**

SYLVIA VALENTIN-MALDONADO, et
al.,

    **Defendants.**

CIVIL NO. 06-1285 (GAG)
CIVIL NO. 06-1517 (GAG)
CIVIL NO. 06-2185 (GAG)

<u>OPINION AND ORDER</u>

    This action was brought by various federal police officers[1] who, at the time of the events

alleged in the complaint, were carrying out police work for the Department of Veterans Affairs at

the San Juan Veterans Affairs Medical Center ("SJ-VMAC") in Puerto Rico.  Plaintiffs claim that

Defendants' surreptitious video surveillance of their locker-break room violated their Fourth

Amendment rights under the Constitution of the United States.  They seek redress under <u>Bivens v.</u>

<u>Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), as recognized

by the court in a previous Opinion and Order entered by Judge Raymond L. Acosta[2] (Docket No. 54,

---

[1]  The named plaintiffs in consolidated cases number 06-1285, 06-1517, and 06-2185 are:
(1) Edward Avila, (2) Jose-Mejias Santiago, (3) Pedro Flores-Torrent, (4) Ana Gertrudis Colon-
Dominguez,  (5) Efrain Laureano-Abrams, (6) Jose Calderon-Rodriguez, (7) Ivis Montes-Andujar,
(8) Hector Guzman-Rivera, (9) Lisbeth Perez-Oliveras, (10) Gizelle C. Ruiz, (11) German Legarreta-
Lopez, (12) Reynaldo Laureano, (13) Hector Rosario, (14) Miguel Roman, (15) Edwin Castillo, (16)
Antonio Falu, (17) Aladino Collazo, (18) Erick Diaz, (19) Arthur Planadeball, (20) Alex Caseres,
(21) Iraida Lebron, (22) Efrain Cruz, (23) Rafael Lopez, (24) Francisco Sanchez, (25) Enelida
Gonzalez, (26) Angel R. Medina, (27) Edel Gil-Gutierrez, (28) Marcos Giraud, (29) Benigno
Carrion (Ayala), (30) Jose Arroyo, (31) Rafael Alvira, (32) Gustavo Ayala, (33) Albert Santiago, and
(34) Eddie Sanchez.

[2]  Senior Judge Raymond L. Acosta retired on February 1, 2010 and, consequently, this case
was randomly reassigned to the undersigned District Judge.  (<u>See</u> Docket No. 109.)

Civil No. 06-1285 (GAG)

14-17).[3]

Defendants now move the court for summary judgment, arguing that Defendants are entitled to qualified immunity.[4]  (See Docket No. 72.)   The court having reviewed the arguments presented by the parties, as well as the documents attached thereto, hereby **GRANTS** Defendants motion for summary judgment (Docket No. 72).

**I.     Standard of Review**

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law'." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325.  The nonmoving party must then "set forth specific

---

[3] This action was initially brought pursuant to the Federal Tort Claims Act ("FTCA"), 20 U.S.C. §§ 2671-2680.  However, in its previous Opinion and Order (Docket No. 54) the court determined that, because the United States is the sole proper defendant under the FTCA and it was no longer a party to this action for failure to properly and timely serve summons (see Docket Nos. 26, 27, 29), Plaintiffs were precluded from prosecuting any tort-based causes of action in these proceedings.  Plaintiffs' supplemental claims for alleged violations to dignity and privacy under the Puerto Rico constitution were also dismissed.  The court further held that, since no other grounds for government liability appear in the complaint, Plaintiffs were precluded from asserting any claims against the named defendants in their official capacities.  The court stated that "[P]laintiffs' sole remedy for their Fourth Amendment claims may only be prosecuted against the individual defendants under Bivens."  (Docket No. 54, 17.)

[4] In addition, Defendants assert various arguments for dismissal of Plaintiffs' FTCA claim.  However, as previously mentioned (supra note 2), the court already dismissed Plaintiffs' FTCA claim in its Opinion and Order at Docket No. 54.  Therefore, the court will disregard Defendants' arguments related to Plaintiffs' defunct FTCA claim.

**Civil No. 06-1285 (GAG)**

1  facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  If the court finds that some

2  genuine factual issue remains, the resolution of which could affect the outcome of the case, then the

3  court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4  (1986).

5  When considering a motion for summary judgment, the court must view the evidence in the

6  light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of

7  any and all reasonable inferences. Id. at 255.  Moreover, at the summary judgment stage, the court

8  does not make credibility determinations or weigh the evidence. Id.  Summary judgment may be

9  appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations,

10  improbable inferences, and unsupported speculation."  Forestier Fradera v. Municipality of

11  Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166,

12  173 (1st Cir. 2003)).

13  **II.       Relevant Factual Background**

14  Between May 2003 and March 2004, the SJ-VMAC Police Force had received four

15  complaints by female police officers of sexual orientation discrimination, sexual harassment,

16  defamation, and hostile work environment.  One such complaint was made by Officer Raquel

17  Rosario ("Officer Rosario") in June 2003, which led to an investigation and a finding that Rosario

18  had indeed been subjected to unwelcome advances by a fellow police officer.  Though the

19  investigation concluded that the officer's behavior did not rise to the level of sexual harassment, it

20  did find evidence of a hostile work environment and that management had failed to properly address

21  Officer Rosario's complaint.  The Police Chief was ordered to take action to improve the work

22  environment, including supervisor sexual harassment training and instruction.

23  Subsequently, on March 1, 2004, Lt. Roberto Alonso ("Lt. Alonso") received a complaint

24  from Officer Rosario that someone had placed a harassing note in her locker.  The note contained

25  an excerpt from an internal memorandum of the SJ-VMAC in which it is stated that officers can be

26  subjected to disciplinary action for bringing false accusations of sexual harassment against fellow

27  police officers. On April 7, 2004, Officer Rosario showed Lt. Alonso another note that had been left

28

Civil No. 06-1285 (GAG)

1  anonymously, which contained religious scripture and suggested that Officer Rosario should visit
2  a spiritual counselor.

3      On or about the first week of April 2004, a video camera was installed on the ceiling of the
4  VA Police Service's locker-break room, which houses the lockers assigned to each police officer to
5  store their official equipment.  The camera had a small fixed lens, no audio, and recorded to a video
6  cassette.  It was focused on the locker of Officer Rosario but its field of vision encompassed three
7  of the lockers, the floor and part of the eating area (i.e. a table with two chairs that came in and out
8  of view depending on their use).  The lockers in the locker-break room are not full-size lockers
9  intended to store garments.  Rather, they are half-sized lockers intended for storing official
10  equipment such as belts, flashlights, handcuffs, etc. at the end of each officer's tour of duty.  Within
11  the locker-break room there is a bathroom with its own door and an evidence room, which is a small
12  enclosed space used to hold evidence taken from detainees.  The bathroom can also be used by
13  persons in the holding cell nearby.  The locker-break room is intended for the use of all of the
14  employees under the Police Service; employees from other services in the SJ-VAMC are not
15  authorized to use this room.

16      The camera was discovered on May 2, 2004 and removed the following day.  The four tapes
17  recorded by the camera cover from April 12th to 26th, 2004.  Thereafter, no administrative actions
18  were taken based on the tapes recovered, since no harassment or other misconduct could be observed
19  on the same.

20  **III.    Discussion**

21      The doctrine of qualified immunity protects federal and state officials from civil liability in
22  the performance of "discretionary functions . . . insofar as their conduct does not violate clearly
23  established statutory or constitutional rights of which a reasonable person would have known."
24  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Under Saucier v. Katz, 533 U.S. 194, 201 (2001),
25  as modified by the Supreme Court's recent decision in Pearson v. Callahan, 129 S. Ct. 808, 815-16
26  (2009), the qualified immunity test takes the form of a two-part inquiry.  See Guillemard-Ginorio
27  v. Contreras-Gomez, 585 F.3d 508, 526 (1st Cir. 2009).  "First, a court must decide whether the facts

28

4

**Civil No. 06-1285 (GAG)**

1   a plaintiff has . . . shown . . . make out a violation of a constitutional right," and "[s]econd, if the

2   plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly

3   established' at the time of defendant's alleged misconduct." Pearson, 129 S. Ct. at 815-16 (citing

4   Saucier, 533 U.S. at 201).[5]  "While Pearson rendered the sequential nature of the Saucier analysis

5   permissive rather than mandatory, it left intact the substantive content of the two-part test."

6   Guillermard-Ginorio, 585 F.3d at 526 (citing Pearson, 129 S. Ct. at 818; Maldonado, 568 F.3d at

7   268-29).

8        The Fourth Amendment provides the people a right "to be secure in their persons, houses,

9   papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  The

10  seminal case interpreting the Fourth Amendment, Katz v. United States, 389 U.S. 347 (1967), held

11  that "[it] protects people, not places. What a person knowingly exposes to the public, even in his

12  own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve

13  as private, even in an area accessible to the public, may be constitutionally protected." Id. at 351-52

14  (citations omitted).  "Intrusions upon personal privacy," however, "do not invariably implicate the

15  Fourth Amendment . . . [S]uch intrusions cross the constitutional line only if the challenged conduct

16  infringes upon some reasonable expectation of privacy." Vega-Rodriguez v. Puerto Rico Tel. Co.,

17  110 F.3d 174, 178 (1st Cir. 1997) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus,

18  Fourth Amendment protection requires that a person have a subjective expectation of privacy that

19  society is prepared to recognize as reasonable.  See id. (citing Oliver v. United States, 466 U.S. 170,

20

21

22      [5] "In administering the Court's test, [the First Circuit] has tended to list separately the two
     sub-parts of the 'clearly established' prong along with the first prong and, as a result, has articulated

23   the qualified immunity test as a three-part test." Guilermard-Ginorio, 585 F.3d at 526 n.1 (quoting
     Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).  In Maldonado, however, the First

24   Circuit "adopt[ed] the [Supreme] Court's two-part test and abandon[ed] [its] previous usage of a
     three step analysis."  Guillermard-Ginorio, 585 F.3d at 526 n.1 (quoting Maldonado, 568 F.3d at

25   269).  For this reason, the court here applies the two-step approach, despite the parties having
     referenced the three-step approach in their filings.  But see Bergerson v. Cabral, 560 F.3d 1, 7 n.2

26   (1st Cir. 2009) (explaining that "[t]he three-step approach is functionally equivalent to the two-step
     approach" and holding that the resolution of the case would be the same "regardless of [the]

27   methodology . . . employed").

28

Civil No. 06-1285 (GAG)

1    177 (1984); Smith, 442 U.S. at 740).

2        The protections of the Fourth Amendment extend to undue government intrusions both in

3    civil and criminal settings, "safeguard[ing] inviduals not only against the government *qua* law

4    enforcer but also *qua* employer." Vega-Rodriguez, 110 F.3d at 179 (citing National Treasury

5    Employees Union v. Von Raab, 489 U.S 656, 665 (1989)).  As stated by the First Circuit, "[t]he

6    watershed case in this enclave of Fourth Amendment jurisprudence is O'Connor v. Ortega, 480 U.S.

7    709 (1987)," where the Supreme Court determined that "a public employee sometimes may enjoy

8    a reasonable expectation of privacy in his or her workplace vis-a-vis searches by a supervisor or

9    other representative of a public employer." Id.  While the "'operational realities of the workplace,'

10   such as actual office practices, procedures, or regulations, frequently may undermine employees'

11   privacy expectations," Id. (citing O'Connor, 480 U.S. at 717)), "the objective component of an

12   employee's professed expectation of privacy must be assessed in the full context of the particular

13   employment relation." Id. (citing O'Connor, 480 U.S. at 717; United States v. Mancini, 8 F.3d 104,

14   109 (1st Cir. 1993) (considering the totality of the circumstances)).

15       In the court's previous Opinion and Order[6] (see Docket No. 54 at 20-36), Judge Acosta

16   applied this analysis to the uncontested facts and determined that "no reasonable jury could find that

17   plaintiffs did not have a reasonable expectation of being free from covert video surveillance while

18   in the locker-break room." (Docket No. 54 at 30.)  The court looked to Trujillo v. City of Ontario,

19   428 F. Supp. 2d 1094 (C.D.Cal. 2006), where the Central District of California ruled that despite the

20   communal nature of the locker room and the fact that plaintiffs were subject to minimal intrusions,

21   "[t]his does not diminish the reasonableness of a person's expectation to be free from covert video

22   surveillance." Id. at 1104 (citing to United States v. Taketa, 923 F.2d 665, 667 (9th Cir. 1991)

23   (finding that zones of privacy may be created where people may not reasonably be videotaped, even

24

25   _____

26       [6] The court notes that, because Defendants submitted proposed unconstested facts as well as
     extrinsic evidence in support of their thesis that Plaintiffs did not have a viable Fourth Amendment
27   claim, Judge Acosta examined Defendants' motion to dismiss (Docket No. 32) as to this particular
     under the strictures of Rule 56, rather than Rule 12(b)(6).  (See Docket No. 54 at 6-11.)
28

Civil No. 06-1285 (GAG)

1   when they do not own or control the place searched or could not reasonably challenge a search at

2   some other time or by some other means)).  This Ninth Circuit jurisprudence is based on the

3   Supreme Court's analysis in Katz, whereby the nature of the government's intrusion can affect

4   whether a person has a reasonable expectation of privacy.  See id., 389 U.S. at 351-52 (holding that

5   a person in a glass phone booth has a reasonable expectation that his or her conversation will not be

6   intercepted, but he does not have a reasonable expectation that people will not view his or her

7   actions while in the booth).  More importantly, however, it is based on a "recognition of the

8   exceptional intrusiveness of video surveillance." Taketa, 923 F.2d at 678 (criminal investigation);

9   see also United States v. Nerber, 222 F.3d 597, 603 (9th Cir. 2000) (finding that nature of the

10  governmental intrusion is a factor courts should consider, and "[h]idden video surveillance is one

11  of the most intrusive investigative mechanisms available to law enforcement) (criminal

12  investigation); Bernhard v. City of Ontario, 270 Fed. Appx. 518 (9th Cir. 2008) (same) (criminal

13  investigation); accord United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987) (noting

14  that hidden video surveillance invokes images of the "Orwellian state" and is regarded by society

15  as more egregious than other kinds of intrusions) (criminal investigation); United States v.

16  Mesa-Rincon, 911 F.2d 1433, 1442 (10th Cir. 1990) ("Because of the invasive nature of video

17  surveillance, the government's showing of necessity must be very high to justify its use") (criminal

18  investigation).

19      Judge Acosta then went on to apply the standard set forth by the Supreme Court in O'Connor

20  to determine whether Defendants' search was reasonable.  (See Docket No. 54 at 31-36.)  Under

21  O'Connor, the court first considers whether the work-related investigatory search was justified at

22  its inception.  "Ordinarily, a search of an employee's office by a supervisor will be 'justified at its

23  inception' when there are reasonable grounds for suspecting that the search will turn up evidence

24  that the employee is guilty of work-related misconduct . . ." 480 U.S. at 726.  Second, the court

25  determines "whether the search as actually conducted was reasonably related in scope to the

26  circumstances which justified the interference in the first place." O'Connor, 480 U.S. 726.  "[A

27  work-related, investigatory] search will be permissible in its scope when 'the measures adopted are

28

7

Civil No. 06-1285 (GAG)

1  reasonably related to the objectives of the search and not excessively intrusive in light of . . . the

2  nature of the [misconduct].'" 480 U.S.at 726 (quoting N.J. v. T. L. O., 469 U.S. 325, 342 (1985)).

3      Judge Acosta applied this standard to Defendants' stated purpose for conducting video

4  surveillance: their interest in eradicating sexual harassment and discrimination in the employment

5  setting, given that previous steps to correct the problem had proven ineffective.  (See Docket No.

6  54 at 35.)  He concluded that there did not seem to be a logical connection between the conduct

7  sought to be curtailed and the preventive measures taken, and ruled that "even though defendants

8  have a legitimate interest in eradicating sexual disrimination in the workplace there is not sufficient

9  evidence in the record at this time to warrant encroachment into plaintiffs' privacy interests via

10  surveillance video." (Id. at 36.)  The court does not now find any additional evidence on the record

11  that would cause it to amend Judge Acosta's previous determination on this point.

12      Notwithstanding, Defendants assert an alternative reason for their use of covert video

13  surveillance in the locker-break room.  They contend that they sought to identify the employee who

14  was leaving threatening notes in Officer Rosario's locker.  (Docket No. 72-2 at 8).  Based on the

15  evidence before it, the court understands that on this theory there were reasonable grounds for the

16  Defendants to suspect that the search would "turn up evidence . . . [of] . . . work-related

17  misconduct."  O'Connor, 480 U.S. at 726.  Defendants focused the camera on Officer Rosario's

18  locker and its immediate vicinity, shortly after she had reported receiving two notes in her locker

19  containing intimidating language relating to her claim of sexual harassment.  The camera was

20  continuously taping for a period of two weeks.  It was reasonable for Defendants to suspect that if

21  Officer Rosario's harasser left a third note in her locker, they would be able to identify him or her

22  by reviewing the video tapes.  Though the court recognizes that covert video surveillance raises

23  particular concerns under the Fourth Amendment, it understands that, given the particularly

24  eggregious conduct at issue here and the limited scope of the camera's field of vision, Defendants

25  adopted a measure that was "reasonably related to the objectives of the search and not excessively

26  intrusive."  Id.

27      In drawing this conclusion, the court notes that the O'Connor test elaborated by the Supreme

28

**Civil No. 06-1285 (GAG)**

1  Court, applicable to "legitimate work-related, noninvestigatory intrusions as well as investigations

2  of work-related misconduct," 480 U.S. at 722-25, is a more relaxed reasonableness standard than

3  the warrant and probable cause requirements that the Fourth Amendment imposes on searches

4  conducted as part of criminal investigations.  Moreover, even if the court were to find, as Plaintiffs

5  argue, that the use of video surveillance without notification to the plaintiffs was unreasonable,

6  Defendants would still benefit from qualified immunity.

7     Under the second prong of the qualified immunity analysis, the court considers both the

8  clarity of the law at the time of the alleged civil rights violation and the concrete facts of the

9  particular case, to determine whether a reasonable defendant would have understood that his conduct

10  violated the plaintiffs' constitutional rights.  See Maldonado, 568 F.3d at 269.  The law is considered

11  clearly established "either if courts have previously ruled that materially similar conduct was

12  unconstitutional, or if 'a general constitutional rule already identified in the decisional law [applies]

13  with obvious clarity to the specific conduct' at issue." Jennings v. Jones, 499 F.3d 2, 16 (1st Cir.

14  2007) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)).  "Cognizant of both the contours

15  of the allegedly infringed right and the particular facts of the case, '[t]he relevant, dispositive inquiry

16  in determining whether a right is clearly established is whether it would be clear to a reasonable

17  officer that his conduct was unlawful in the situation he confronted.'" Maldonado, 568 F.3d at 269

18  (quoting Brousseau v. Haugen, 543 U.S. 194, 198 (2004)).  In other words, even if the right at issue

19  was clearly established in certain respects, an officer is still entitled to qualified immunity if "officers

20  of reasonable competence could disagree" on the legality of the action at issue in its particular

21  factual context. Malley v. Briggs, 475 U.S. 335, 341 (1986) (also observing that qualified immunity

22  protects "all but the plainly incompetent or those who knowingly violate the law").

23     The court finds that, under the specific facts of this case, it could not have been clear to

24  Defendants that their actions were violative of Plaintiffs' Fourth Amendment rights**.**  The parties

25  have not cited, and the court has not found, jurisprudence from the Supreme Court or the First

26  Circuit that clearly establishes Plaintiffs' privacy interest in the locker-break room.  Under

27  O'Connor, a determination that a zone of privacy has been created within a workplace is to be made

28

Civil No. 06-1285 (GAG)

on a case-by-case basis; no bright lines have been drawn.  Here, Judge Acosta relied on Ninth Circuit

jurisprudence to bolster his analysis that, despite the communal nature of the locker-break room,

Plaintiffs had a reasonable expectation not to be surveilled by covert video cameras.  That is, Judge

Acosta reasoned, as the Ninth Circuit has, that a reasonable expectation of privacy can be found

based on Katz and the nature of the search at issue: covert video surveillance.  These cases, however,

revolved around the use of covert video surveillance for searches made pursuant to criminal

investigations, while the search at issue here was a work-related investigatory search.  Moreover,

in Vega-Rodriguez, the First Circuit found that there is nothing "constitutionally sinister about

videotaping," so long as the underlyling basis for the search is lawful under the Fourth Amendment.

110 F.3d at 180-8.

Vega-Rodriguez involved the video monitoring of employee activity that was in plain view,

within an open work area.  The First Circuit emphasized that the plain view argument in the context

of electronic surveillance was more presuasive because the employer had acted overtly, putting its

work force on notice that video cameras would be installed and disclosing their field of vision.

See Id., 110 F. 3d at 180.  In rejecting the appellants' argument that electronic surveillance was *per

se* unconstitutional, the Court cautioned, without more, that "cases involving the covert use of

clandestine cameras, or cases involving electronically-assisted eavesdropping, may be quite another

story." Id. at 180 n.5.  However, despite the First Circuit's admonition in Vega-Rodriguez, the court

notes that the parties have not pointed out, nor has the court found, any subsequent cases from the

First Circuit dealing with the intersection of the Fourth Amendment and the covert use of video

surveillance in the workplace.  Therefore, there was no clear guidance for the defendants in this case

on the particular set of facts here at issue.  Although "officials can still be on notice that their

conduct violates established law even in novel factual circumstances," Hope v. Pelzer, 536 U.S. 730,

741 (2002) (citing Lanier, 520 U.S. at 270-71), "[i]n some circumstances, as when an earlier case

expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very

high degree of prior factual particularity may be necessary," Lanier, 520 U.S. at 270-71 (citing

Mitchell v. Forsyth, 472 U.S. 511, 530-35 (1985)).

Civil No. 06-1285 (GAG)

The court understands that in this case, "officers of reasonable competence could [have] disagree[d]" on the legality of the action at issue. <u>Malley</u>, 475 U.S. at 341.  This, coupled with the court's analysis regarding the reasonability of Defendants' conduct, suffices for a determination that Defendants are entitled to qualified immunity.

**IV.      Conclusion**

For the aforementioned reasons, the court **GRANTS** Defendants' motion for summary judgment (Docket No. 72).  Plaintiffs' Fourth Amendment claim is hereby **DISMISSED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 12th day of March, 2010.

*s/ Gustavo A. Gelpí*

GUSTAVO A. GELPI
United States District Judge

11